Filed 8/23/16  In re V.R. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re V.R. et al., Persons Coming Under the Juvenile Court Law. | B269369<br><br>(Los Angeles County<br>Super. Ct. No.DK13628) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>RANDOLPH R.,<br><br>      Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Nichelle L. Blackwell, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

Daniel G. Rooney, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, R. Keith Davis, Acting Assistant County Counsel, Brian Mahler, Deputy County Counsel, for Plaintiff and Respondent.

**INTRODUCTION**

The trial court found true allegations that Randolph R. (father), father of 12-year-old V.R. and eight-year-old A.R., physically and emotionally abused the two minors. The boys were released to their mother's care. The court ordered father to have monitored visitation with A.R., but ordered that father would have no visitation with V.R. until further order of the court. Father appeals the no-visitation portion of the order.

We affirm. The evidence showed that V.R. experienced depression, suicidal ideation, and a suicide attempt arising from years of abuse, and V.R. insisted that he did not want to visit his father. There was ample evidence to support the court's finding that visitation would be detrimental to V.R.'s safety and emotional well-being.

**BACKGROUND**

**A.      Factual background**

On September 21, 2015, the Department of Children and Family Services (DCFS) responded to a report involving V.R. and A.R. The reporting party stated that father hit V.R. in the face about six days earlier, causing V.R. to fall backward onto a vacuum cleaner, hit his head, and lose consciousness. The following facts are from the DCFS detention report, police report, DCFS jurisdiction/disposition report, and related interviews with the children.

When a DCFS social worker and a police officer interviewed V.R. and A.R., both children said the report was true. Father and the children's mother (mother) were divorced, and the children lived with father two days each week. V.R. said that during their last visit, father slapped him on his face, which knocked him backward onto the floor, and caused him to hit his head and back on a vacuum cleaner. V.R. did not recall losing consciousness, but he remembered crying because it hurt. A.R. reported the same thing, but recalled that when V.R. hit the floor he was "knocked out" and stopped moving, while father yelled at V.R. to get up. A forensic psychologist noted that "based on the statements provided by the children, it sounds like the child [V.R.] was unconscious for a short time following the abuse by the father."

2

The boys reported that another incident occurred later the same day. Father told the boys not to play on a trampoline, and they disobeyed him and played on the trampoline anyway. A.R. broke a pole on the trampoline, but the children did not want to tell their father because they were not supposed to be playing on it. V.R. reported that when father found out that A.R. broke the trampoline, he got angry with V.R. for not telling him, and slapped V.R. even harder than he had earlier that day. V.R. later stated that father slapped him twice in a row during this incident, and the second time, the slap caused V.R.'s head to hit a nearby door frame. A.R. confirmed this by reporting that during this incident, V.R. was knocked backward into the kitchen wall.

V.R. reported that father hit him nearly every visit. V.R. also reported that father would hit him with a belt, kick him, punch him, pull his hair, and throw things at him. V.R. said that father "will grab our face to pull us in" to "talk[ ] to us about what we did wrong"; father used to do this by pulling the boys' hair, but then the boys began to "get haircuts so he can't pull our hair anymore." V.R. said sometimes father "will grab our wrist and bend it down." A.R. said father would "squeeze our arms and our face really hard."

V.R. also stated that his father calls him "piece of shit" and "stupid asshole," and said his father calls him derogatory names on a regular basis. A.R. reported that father called them names and bad words, including (as written in the DCFS report) "brat," "f'n retard," and "the 'b' word." A.R. said father does not want to have them, and he felt as if father did not care about them. Both boys said they were afraid of father. V.R. and A.R. both said that father threatened to punish them if they told their mother about the abuse. A.R. said that father told him, "If you ever tell anyone this happened I will spank you on your bare bottom until it bleeds." A.R. told a police officer that father had hit them as long as he could remember.

When asked, V.R. recalled earlier incidents of abuse. Earlier that year, father told the boys to choose who they liked more, mother or father. V.R. said mother, and father said, "Are you sure?" and asked again who he liked more. When V.R. said mother again, father slapped V.R.'s face, causing him to cry. Father asked V.R. a third time who he

3

liked more, and V.R. said he liked father and mother the same. A.R. also recalled this incident in a separate interview. In another incident, mother had emailed father and called him a bully. Father asked V.R. if he thought father was a bully, and V.R. said yes. Father then bent V.R.'s wrist backward, causing V.R. pain that made him cry. In another incident, V.R. reported that father "kicked me because he got mad that my brother and I were laughing and messing around when we were supposed to be doing our homework." V.R. said that sometimes when he and his brother are "laughing, talking too loud or just messing around" father "will tell us to stop first and other times he just hits us and says that he does not need to tell us to stop, that we should know this already." V.R also said for discipline, father would make them do "a bunch of push-ups, like 50 [push-ups], and he will make us do it in public sometimes because he can't slap us in public." V.R. reported that "a couple of years" earlier, "[w]e were talking too loud at a pizza restaurant and I was being annoying so he punched me in the stomach. He has also punched my brother in the stomach a different time." V.R. also said that when he was in fourth grade, father held him down on the floor and slapped him a couple of times: "He was on top of me slapping me. I don't remember why he did that."

When the social worker asked V.R. how he felt about not having to visit his father pending the court hearing, V.R. replied, "peaceful." V.R. said he was afraid that his father would "seriously injure me or my brother one day." V.R. admitted that he tried to hurt himself "a couple of years" prior because he was sad, but that he stopped wanting to hurt himself when he started attending therapy. When he was asked if he still felt sad, V.R. said, "Not anymore because I am living with my mom. I wanted to live with my mom and not with my dad because he is mean to us." A.R. said he never had thoughts of hurting himself. A.R. also said he did not want to see his father, but that he might want to in a few months. When asked why he didn't want to visit, A.R. said, "Because the last time I saw him he was trying to act nice so that I would want to go back to his house so he can beat us again."

The previous year, in October 2014, mother reported to DCFS that both V.R. and A.R. were victims of physical abuse by father. In one incident, father told V.R. to play

4

his musical instrument. When V.R. refused, father grabbed V.R. by the face and told him, "I will break you if you hit me." V.R. pushed father's hand off his face, after which father knocked him to the ground and sat on his chest. In a second incident, A.R. spilled dog food on the floor. As A.R. began cleaning up the spilled food, father threw a box at A.R., hitting him in the head and hand. DCFS determined the 2014 allegations to be "inconclusive." Mother said that the children did not trust DCFS to protect them, because the 2014 report to DCFS resulted in no assistance. Mother reported that after the 2014 DCFS referral was closed, father threatened the children by saying if they told anyone, "I'll end you."

With respect to the September 2015 report, mother reported that she took V.R. to the doctor because his head was tender after father hit him. The doctor said V.R. had a concussion. Mother reported that the boys had told her before that father hits them, slaps them across the face, and pulls their hair. She said V.R. "only wants short hair cuts because he doesn't want his hair pulled." Mother said she had not observed marks or bruises on the boys, but she also noted that father had a history of martial arts studies and that he prided himself on being able to cause pain without leaving marks. Mother also said the children told her about the time father slapped V.R. twice for saying he liked mother more. Mother said she felt powerless to change anything because of court custody orders, and because after the 2014 report DCFS and police told her that father was simply "strict." Mother said she left father when the boys were very young after a history of domestic violence. She spoke with an attorney about changing custody after V.R. said he did not want to visit his father anymore, but the attorney told her that a 12-year-old's wishes would not be honored by the courts.

Mother reported that father did not allow the boys to call her when they were visiting him. Because the boys were not allowed to call her and father threatened the boys after DCFS found the 2014 allegations to be inconclusive, mother and the children worked out a safety plan for one of the boys to go to mother's friend's house if things got really bad. Mother said, "After I called DCFS last year and nothing happened we had to

5

create a safety plan with the help of [V.R.]'s therapist because [V.R.] was depressed. I had him see a counselor because he felt trapped."

V.R. started therapy for depression and suicidal ideation in mid-2014; A.R. also attended some therapy sessions. Mother said V.R. "was talking about depression, asking questions about it and talking about suicide, saying he hated his life." When asked if V.R. had attempted suicide, mother said she once went in to check on V.R. and found that he had wrapped a shoelace around his neck. Mother attended the therapy sessions with V.R. because he was not comfortable going alone, and said that V.R.'s depression related to his issues with father. In therapy, V.R. drew a picture of father in a graveyard with everyone else smiling, and he wrote a letter to father saying he wished father were dead. In his therapy sessions, V.R. also said that father called him stupid, lazy, dumb, and would curse at him. Mother also stated, "[A.R.] is the favorite. [Father] is much harder on [V.R.]." The boys told mother that they did not want to visit father because they were afraid of him. After DCFS was called, A.R. had nightmares that father would break into mother's home and kidnap him. V.R. said, "I don't want to have any visits with my dad. I don't want to see him."

The therapist who treated V.R. and A.R. in 2014, Dr. Gordon Saint Mary, Jr., reported that when V.R. began therapy, he was depressed and had suicidal ideation with plans. Both boys were afraid of their father, and said that he punished them by hitting and kicking them. V.R. was smart and quiet; he did not express emotions well. A.R. was more gregarious, and father favored him more. Father did not like the boys to cry; when they cried, father told them to stop or he would give them a reason to cry. Dr. Saint Mary did not believe that the boys were being coached by their mother.

A forensic psychologist, Lauren Maltby, Ph.D., reported that the children gave consistent accounts of abuse in forensic interviews. Dr. Maltby stated in her report that the children reported that father engaged in abusive behavior by being uncaring about the harm he causes, being overly controlling, and conducting verbal assaults by calling the children derogatory names. Dr. Maltby also noted that father's behavior involved "terrorizing, including intimidating or coercing a child with violence or the threat of

6

violence," "physically hurting A.R.'s dog," and using the children in marital conflicts, when father asked the boys which parent they preferred and hitting V.R. in the face when he answered that he loved his mother more. Dr. Maltby said that the pattern of abuse V.R. experienced "resulted in significant mental suffering," and said that "[d]irect observation of [V.R.], [V.R.]'s mental health history, and [V.R.]'s own verbal report in his interview indicates that he has experienced mental suffering as a result of [father's] behavior." Dr. Maltby noted V.R.'s history of suicidal ideation and prior attempt to commit suicide, and recommended that V.R.'s "opinion be taken into account as far as the child's wishes to do conjoint counseling with his father and reunification with his father given his age and maturity."

Father denied all of the allegations, saying, "I have never hit [V.R.] with a belt, kicked him, none of that. That is all a lie. I have never punched the kids, thrown objects at them. What can I possibly throw at them? If I slapped, punched, or kicked my kids it would cause severe injuries because I am a lot bigger than them, that is why I will have them do pushups even if we are at the store, about 20 or 30 pushups." Father said his household "is strict, we have discipline and structure, we have boundaries." Father said that he disciplined his children by requiring them to do push-ups or other strenuous exercise. Father also said he grabs the children's faces when they are in trouble, and "I have slapped them on their hands and arms but on the face, that would be harsh, I usually just grab them from the face to talk to them." He said he "scared them by showing them the belt but I never hit them with any objects." When discussing the vacuum cleaner incident, father told the social worker and investigating police officer that it began when V.R. hit A.R. Father said he threatened to hold V.R.'s arms behind his back so A.R. could hit V.R. back. Father did not hold V.R., but A.R. slapped V.R., causing V.R. to hit the wall with his head. Father also denied that he ever pinned V.R. down and slapped him, saying that he only pinned the children down when they were play-fighting. Father also said, "This is all outrageous. My kids are being influenced by someone in the other household. I believe they are using scientologist methods to teach them these persuasive techniques by the mother's boyfriend." He also blamed the accusations on a scheme by

7

mother to move the children to a different school district. Father said he was not aware that his children were afraid of him.

Father also denied he emotionally abused V.R. He said the children's allegations about his cursing at them and calling them names "just tells me that they are being influence[d], what would I possibly say to make someone kill themselves." He said V.R. "is frustrated with me talking to him but that is not causing fear." He denied he ever called the kids names, saying, "None of those words come from me, I don't use those words like brat, these are words that are not in my social world." Father did not know that V.R. had received therapy: "I had never known of [V.R.] wanting to hurt himself in any way. The custody order says no medical treatment can be given to the kids without disclosure and approval by both parents." The reports are inconsistent about father's willingness to attend counseling and parenting classes, saying at one point that he is willing to attend, but saying at another point that he denies he needs such services.

Social workers also spoke with mother's boyfriend, Daniel J. A.R. first told Daniel about the vacuum cleaner incident, and with A.R.'s permission, Daniel told mother. When Daniel asked how many times father hit them, A.R. said approximately a dozen times. Daniel also said A.R. reported incidents in which father allowed A.R. to hit V.R. while father held V.R.'s arms behind his back. Daniel noted that most of the abuse he knew about was directed at V.R.

**B.     Procedural background**

Mother sought a temporary restraining order against father for herself and both boys following the September 21, 2015 call to DCFS. The court entered a temporary order as requested.

DCFS filed a petition under Welfare & Institutions Code section 300, subdivisions (a), (b), (c), and (j)[1] on October 2, 2015. The petition alleged that father physically abused V.R. and A.R. (counts a-1 and a-2, § 300, subd. (a)), father failed to protect V.R. and A.R. (counts b-1 and b-2, § 300, subd. (b)), and father abused V.R.'s and A.R.'s

---

[1] All further statutory references are to the Welfare & Institutions Code unless otherwise indicated.

sibling (counts j-1 and j-2, § 300, subd. (j).)[2] The petition also alleged that father emotionally abused V.R. (count c-1, § 300, subd. (c)), "by using demeaning words toward the child[,] continuously abusing the child and causing the child to fear him. The emotional and physical abuse of the father has caused the child to feel depressed, isolated and have suicidal ideation with plans. Such emotional abuse of the child on the part of the father places the child at substantial risk of suffering serious emotional damage as evidenced by severe anxiety, depression, withdrawal and aggressive behavior toward himself or others."

At the detention hearing, the court found that a prima facie case had been made showing that V.R. and A.R. were persons described in section 300, subdivisions (a), (b), and (j), and that V.R. was a person described in section 300, subdivision (c). The court released V.R. and A.R. to mother, and ordered that father have a monitored visit with A.R. on A.R.'s birthday, which was a few days after the hearing. The court also ordered that father could have two monitored visits per week with A.R., and father would have no visits with V.R. pending a further order of the court.

The jurisdictional hearing was held on November 19, 2015. Counsel for DCFS, mother, and the children each argued that the evidence supported the allegations in the petition. Counsel for father argued that the allegations should be dismissed for lack of evidence. The court found that "there's a wealth of information in these pleadings to indicate that the allegations of a-1, b-1, a-2, b-2, c-1, and the j-1 and j-2 allegations are true." The court found that V.R. and A.R. were persons described by section 300, and that jurisdiction existed. The court also found it was appropriate to issue a restraining order, and that "there is a basis to restrain [father] from contact with his children."

The court asked about disposition case plans, and counsel for DCFS stated, "The children are not interested – well, [V.R.] is not interested in visitation still." Counsel for the children added, "Nor is he ready for it." The court asked if A.R. was resisting

---

[2] The petition also alleged that mother failed to protect the children and that there was a history of domestic violence between father and mother, DCFS dismissed those allegations and they were stricken from the petition.

9

visitation, and counsel for the minors answered, no, "I said [V.R.] wasn't ready for them. And I would request no visits." She added that department discretion for monitored visits with A.R. was fine, but "I would not agree to discretion to the Department with respect to [V.R.]." Father's counsel objected, saying that "the kids['] desire or interest as it's being described in visitation is not what is triggered in reunification services." Counsel for the children responded that before the court entertained the idea of visitation between V.R. and father, evidence from a therapist about the effects of visitation on V.R. should be presented, because "it has nothing to do with whether [V.R.] wants to visit. I'm talking about whether it would be detrimental to him."

The court said, "I'm not going to force him to visit, so I'm not going to do that. I already issued that order previously at the detention, that there are to be no visits between father and [V.R.], only about -- upon [V.R.] being prepared and ready to reunify with his father. I'm not going to force him to visit with him, so that won't happen." After discussing restraining order issues, counsel for mother stated, "Mother shares these concerns about the child being reluctant about visits," and "the social worker is insisting on visits happening anyway," despite the existing court order. Counsel for DCFS added, "I have to agree, actually, with father's counsel that the issue is not whether the children want to go visit or not. More is required and the showing of detriment is required. I don't think there's any question with respect to [V.R.] that that showing can be made and has been made."

The court stated, "The court will maintain its order that [V.R.] is not required to have any visits with his father until he is ready. . . . And at this point, there is a detriment to having [V.R.] visit with his father at this time, especially since the court is sustaining the [(c)] count and the evidence I have with respect to the [(c)] count." Father's counsel objected again, saying, "I don't believe that order is consistent with case law as it is worded. I don't believe the court can base the order on the child's stated preference regarding visitation." The court asked, "Is there a case that you can cite me that tells me I can't consider the child's interest in wanting to visit his father . . . when we have a c count that I have sustained?" Father's counsel responded, "No. That's not what I

10

indicated. I said I don't believe the court can condition the start of visitation solely on the child's interest or expressed desire to visit or not." The court responded that it would phrase the order as "No visitations between [V.R.] and father unless and until the court orders otherwise." The court entered the order as stated.

Father timely appealed.

## STANDARD OF REVIEW

Father presents the question on appeal as follows: "A finding of detriment to the child or harm to the child's well-being is a prerequisite to denial of visitation. Did the court err by failing to articulate a factual basis for a finding and by allowing the child to decide when he was ready for visits with his father?"

"We review an order setting visitation terms for abuse of discretion. . . . We will not disturb the order unless the trial court made an arbitrary, capricious, or patently absurd determination. [Citation.]" (*In re Brittany C*. (2011) 191 Cal.App.4th 1343, 1356 (*Brittany C*.).)[3]

## DISCUSSION

"When the state removes children from their parents, it is obliged to make reasonable efforts to reunify the family." (*In re Julie M*. (1999) 69 Cal.App.4th 41, 49 (*Julie M*.).) A "prerequisite to family reunification is regular visits between the noncustodial parent or parents and the dependent children 'as frequent[ly] as possible, consistent with the well-being of the minor.' (Welf. & Inst. Code, § 362.1, subd. (a); Cal. Rules of Court, rule 1456(e)(2).)" (*Julie M*., *supra*, at p. 49.)

However, "[n]o visitation order shall jeopardize the safety of the child." (§ 362.1, subd. (a)(1)(B); see also *In re C.C., supra*, 172 Cal.App.4th at p. 1491 ["some visitation is mandatory unless the court specifically finds any visitation with the parent would pose a threat to the child's *safety*"].) "[T]he parents' interest in the care, custody and companionship of their children is not to be maintained at the child's expense." (*In re*

---

[3] Some cases apply the substantial evidence standard. (See, e.g., *In re C.C.* (2009) 172 Cal.App.4th 1481, 1492; *In re Mark L.* (2001) 94 Cal.App.4th 573, 581.) Our decision would be the same under either standard.

11

*S.H.* (2003) 111 Cal.App.4th 310, 317.) When visitation would be harmful to a child's emotional well-being, therefore, the court may temporarily suspend visitation; a court is not "required to sit idly by while a child suffer[s] extreme emotional damage caused by ongoing visits." (*Brittany C.*, *supra*, 191 Cal.App.4th at p. 1357.)

Father is correct that visitation may not be based solely on the wishes of the child. "[T]he power to decide whether any visitation occurs belongs to the court alone. [Citations.] . . . . When the court abdicates its discretion in that regard and permits a third party, whether social worker, therapist or the child, to determine whether any visitation will occur, the court violates the separation of powers doctrine." (*In re S.H.*, *supra*, 111 Cal.App.4th at pp. 317-318; see also *Julie M.*, *supra*, 69 Cal.App.4th at p. 48 ["The juvenile court did abuse its discretion in giving the children absolute discretion to decide whether Lorraine could visit with them."].)

Father argues that the court "directly gave [V.R.] the power to veto all visits until he informed his therapist he was 'prepared and ready.' It thereby impermissibly allowed [V.R.]'s aversion to visitation to be the sole factor in determining whether visitation would ever take place." The record does not support this version of events. Although the court's initial phrasing of the order suggested that V.R. would have no visitation with father "until he is ready" thus suggesting that the decision as to when visitation would begin would be V.R.'s alone—counsel for father and DCFS pointed out that such an order would be inappropriate. The court then changed its order to state that the decision to order visitation would be the court's: "The court will order a no visitation order for father until further court order. I'll issue it that way. No visitations between [V.R.] and father unless and until the court orders otherwise." The minute order states, "No visits for father with [V.R.] pending further order of the court." Although the court's initial phrasing of the order suggested that V.R. would control when visitation began, the final decision and order properly places further decisions regarding visitation with the court.

Moreover, the court made clear that it was considering V.R.'s desires only as one factor, and that the evidence of emotional abuse supporting count c-1 in the petition also informed the court's decision. The court said it was considering "the child's interest in

12

wanting to visit his father" in light of the "c count that I have sustained." This was appropriate, because "the child's input and refusal and the possible adverse consequences if a visit is forced against the child's will are factors to be considered in administering visitation." (*In re S.H., supra*, 111 Cal.App.4th at p. 317.) Considering V.R.'s wishes, along with what the court characterized as "a wealth of information" supporting the allegations of emotional abuse, was therefore not error.

Father argues that although "the court used the word detriment on a single occasion, it never articulated an evidentiary basis for its finding" that visitation would be detrimental to V.R. On appeal, "'[w]e uphold judgments if they are correct for any reason, "regardless of the correctness of the grounds upon which the court reached its conclusion." [Citation.] "It is judicial action and not judicial reasoning which is the subject of review."' [Citation.]" (*In re Jonathan B*. (1992) 5 Cal.App.4th 873, 876.) As stated above, the court's order stating that the court, not V.R., will determine when visitation will begin was not erroneous.

There was ample evidence in the record to support the court's finding that visitation posed a threat to V.R.'s safety. The evidence showed that V.R. suffered significantly at the hands of father, and his physical and emotional well-being were seriously affected. The second DCFS investigation began when father hit V.R. on the face so hard that V.R. was knocked backward into a vacuum cleaner, losing consciousness as father shouted at him to get up. Later the same day, father hit V.R. on the face again, hard enough that V.R.'s head hit a door frame. Similar abuse had occurred for years, with father slapping the children, kicking them, hitting them with a belt, throwing things, grabbing their faces and hair, and bending their wrists back. V.R. began maintaining a short haircut so his father could no longer pull his hair. Father prided himself on being able to hurt the boys without leaving telltale marks of abuse. Father regularly called the boys derogatory names and cursed at them. Moreover, much of the abuse included terrorizing the boys, threatening to spank them until they bled or "end" them if they ever told anyone about the abuse. Father's emotional manipulation included father asking V.R. which parent he liked better, and hitting V.R. in the face

13

when he did not provide answers father liked. Even father admitted to DCFS social workers that he threatened to hold V.R.'s hands behind his back to allow his brother to hit him, and that he threatened to beat the boys with a belt. The forensic psychologist characterized father's behavior as cold, terrorizing, intimidating, and coercive.

V.R.'s reaction to this abuse was serious—he talked about depression, he wanted to end his life, and mother found him with a shoelace wrapped around his neck in an apparent suicide attempt. In addition, after mother reported the abuse to DCFS and police in 2014 but the allegations were found to be inconclusive, V.R. fell into a period of despair in which he felt powerless. Because he was not allowed to call his mother when he was with father, V.R. and mother came up with a safety plan in which the boys could escape to a neighbor's house if father's abuse became too much to bear. Counsel for both DCFS and the minors expressed serious concerns about forcing V.R. to meet with his father against his will, and the forensic psychologist recommended that V.R.'s wishes be considered regarding whether he wanted to visit with father. Moreover, father's denial that his words might cause V.R. to experience depression or suicidal thoughts suggested that he had not begun to take responsibility for his role in affecting V.R.'s emotional well-being.

"While visitation is a key element of reunification, the court must focus on the best interests of the children 'and on the elimination of conditions which led to the juvenile court's finding that the child has suffered, or is at risk of suffering, harm specified in section 300.'" [Citation.] This includes the 'possibility of adverse psychological consequences of an unwanted visit between [parent] and child.' [Citation.]" (*Julie M.*, *supra*, 69 Cal.App.4th at p. 50.) Here, the evidence supports the court's finding that requiring visitation with father against V.R.'s will posed a risk to V.R.'s mental and emotional health. A temporary suspension of visitation between father and V.R. was therefore appropriate.

Father also argues that "there was insufficient evidence [that] limited monitored therapeutic visitation would be detrimental to [V.R.] because a single experimental instance of such a visit never occurred." The court is not required to experiment with a

14

child's safety. When a court makes a finding that visitation poses a risk to a child's safety pursuant to section 362.1, it need not schedule experimental visits to discover whether those findings were correct. To the contrary, a "court may appropriately rely upon an evaluation by treating therapists of the children's emotional condition and evolving needs." (*Julie M., supra*, 69 Cal.App.4th at p. 51.) Experimental visits were not required under the circumstances here.

Although, as noted, "visitation is a key element of reunification" (*Julie M., supra*, 69 Cal.App.4th at p. 50), the court did not abuse its discretion in finding that the evidence supported a finding that ordering immediate visits between V.R. and father posed a threat to V.R.'s safety. The court's order that visitation be temporarily suspended pending a further order of the court was not erroneous.

## DISPOSITION

The juvenile court's order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

COLLINS, J.

We concur:

WILLHITE, Acting P. J.

MANELLA, J.

15